**Isabel SPERBER and Aline K. Halye, Plaintiffs,**

v.

**Ivan F. BOESKY, Defendant.**

**No. 86 Civ. 9232 (GLG).**

United States District Court, S.D. New York.

Nov. 5, 1987.

---

Lowey, Dannenberg & Knapp, P.C. (Richard B. Dannenberg, David C. Harrison, Jill Raskin, of counsel), New York City, for plaintiffs.

Wilmer, Cutler & Pickering (Charles E. Davidow, of counsel), Washington, D.C., Hertzog, Calamari & Gleason by Peter E. Calamari, William Simon, New York City, for defendant.

## OPINION

GOETTEL, District Judge.

This is a putative class action, brought on behalf of all persons who purchased the common stock of, or call options on the stock of, six corporations (the "class corporations") during the period of November 3, 1986 to November 14, 1986. These six corporations are Time Incorporated, USX Corporation, Gillette Company, Holiday Corporation, Public Service Corporation of Indiana, and CooperVision Incorporated. Jurisdiction is based on 18 U.S.C. § 1964(c) (1982).

The motion before us is the defendant's motion to dismiss the complaint under Fed. R.Civ.P. 12(b)(6) for failure to state a claim. For the reasons discussed below, the motion is granted.

## FACTS

On a motion to dismiss, the Court accepts as true the facts alleged in the complaint, and construes them in the light most favorable to the plaintiff. *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). We have culled from the 53 pages of the complaint its most salient allegations. They are as follows.

One of the putative class representatives, Isabel Sperber, purchased 40 CooperVision calls on November 5, 1986, which expired unexercised on November 22, 1986. Her co-plaintiff, Aline K. Halye, purchased 100 shares of Time Incorporated, on November 7, 1986. The complaint alleges that Ms. Halye sold her shares at a loss, but does not indicate when she did so.

The defendant, Ivan F. Boesky, has been engaged in the business of risk arbitrage since 1966. Although his success between 1975 and 1982 was spotty, his success from 1982 until 1986 was extraordinary. Throughout this latter period, Boesky consistently attributed this success to hard work and business acumen, but it later became known that during that time Boesky had engaged in insider trading. On Friday, November 14, 1986, the SEC and the United States Attorney announced that Boesky had agreed to plead guilty to one

count of insider trading and to pay $100 million in fines and disgorged profits.

The stock market reacted quickly to that Friday's revelation. According to the plaintiffs, by the following Monday, prices of the class securities had declined from 7 percent to as much as 32 percent. By this time, however, Boesky had sold his investments [1] in the class corporations. With leave of the Securities Exchange Commission, he had begun selling them in September.

The morass of allegations in this most verbose complaint makes it difficult to pinpoint the plaintiffs' claim. There are several possibilities. The claim most strongly suggested by the entire thrust of the complaint is one for insider trading, based on Boesky's knowledge of the impending SEC announcement when he sold the stocks in the class corporations.[2] However, the plaintiffs disavow any intention to make such a claim. In their memorandum submitted in opposition to this motion, they clearly state that "the complaint is based on the link between the predicate acts and the inflated purchase price, prior to the disclosure of the misconduct, not the November 1986 [pre-announcement] sales." Plaintiffs' Memorandum at 26–27, n. 17. We therefore make no comment on the sufficiency of any insider trading claim based on the pre-announcement sales.[3]

The other claim strongly suggested by the complaint can be framed as follows: because Boesky was extremely successful, and because he attributed his success to hard work and talent, many people copied his investments. Because so many people followed his trades, Boesky's decision to invest in a particular corporation would necessarily drive up the price of that corporation's securities. However, because Boesky's success allegedly was not based on legal methods, but rather on a pattern of racketeering activity, the inflation that his investments caused was "artificial." The plaintiffs' claim thus would appear to be that because Boesky invested in the class corporations before the plaintiffs did so, the plaintiffs necessarily paid an "artificially" inflated price for their own investments in those corporations.[4]

However, at oral argument, the plaintiffs "clarified" their claim to be one which reaches even further than the one just described. At oral argument, the plaintiffs acknowledged that at the time they purchased their securities, they had no knowledge of whether Boesky had invested in these corporations—they therefore did not base their own investments on any such knowledge—and indeed were not even aware that he owned securities in the class corporations until after the SEC announcement.[5] This revelation leads us to a third interpretation of the complaint. Under this third construction, the plaintiffs' claim is not based on the allegation that Boesky's "presence in a takeover stock acted as a recommendation to investors" which drove up the price of that security. Plaintiffs' Memorandum at 14. Rather, their claim is based on the allegation that Boesky's activ-

1. The plaintiffs do not indicate the nature of Boesky's investments in these companies.

2. See, e.g., Complaint at 10 (¶ 11), 48 (¶ 105), 49–50 (¶ 110), and 51 (¶ 112).

3. There are a number of other cases against Boesky pending in this district before another judge. It may be that one or more of those cases has preempted this theory.

4. This conclusion does not follow from the theory on which it is based. The premise of the theory is that the very fact that Boesky invested in a particular stock acted as a recommendation to buy that stock and thereby raised the price of that stock. However, the class is composed of persons who invested in the class corporations as Boesky was *selling* his investments. Com-

plaint at 10, ¶ 11. And if we accept the theory, then it follows that Boesky's disinvesting in a particular stock would act as a recommendation to sell that stock and thereby depress the price of that stock. Thus according to the very theory on which this claim is based, the price that the plaintiffs paid for their securities may have been "artificially" *deflated*.

5. They do not, however, indicate whether or not the *market* knew that Boesky had invested in the class corporations. It is the market's knowledge, rather than the individual investor's, which bears most strongly on the claim described above. But even assuming the market did know, in light of the size of Boesky's investments and in light of SEC reporting requirements, the plaintiffs could not state a claim, for the reasons indicated below.

ity in the market for takeover securities affected prices in that market *as a whole.* Their claim is, in effect, that by being a successful arbitrageur and attributing his success to legal methods, Boesky attracted many others to invest in takeover securities and thereby drove up prices throughout the takeover securities market—for securities in which he had invested as well as securities in which he had not.[6] However, because his success could be attributed to illegal insider trading, the inflation caused by his popularization of the takeover market was "artificial."

Under either or both of these premises, the plaintiffs seek to recover under RICO for having paid allegedly inflated prices for their securities, and for alleged injuries arising from the drop in the prices of the class securities following the SEC announcement.[7]

The complaint, and the plaintiffs' memorandum, most strongly support the former reading of the complaint. That is, the complaint raises a claim that Boesky inflated prices in those securities in which he invested, rather than a claim that Boesky raised prices throughout the takeover securities market as a whole, for securities in which he did invest as well as for securities in which he did not. However, the latter claim arguably can be fashioned out of those documents as well. We need not devote much effort to unraveling this mystery, because under either interpretation of the complaint, the plaintiffs do not state a cause of action under RICO.

**6.** Given the premise of this claim—that Boesky affected prices throughout the takeover market, including the prices of securities of corporations in which he did not invest—it seems curious that the plaintiffs have restricted the class corporations to those in which he did invest. Presumably the fact that Boesky had invested in the class corporations' securities is relevant only insofar as it "proves" that the class corporations were takeover targets.

**7.** The plaintiffs claim that these alleged injuries stem from a pattern of racketeering activity in violation of the RICO statute. This pattern is alleged to consist of the insider trading, fraud, and commercial bribery allegedly committed by Boesky, and Boesky's representations that his

## DISCUSSION

We address first the plaintiffs' claim that Boesky is liable to them for the depressing effect the SEC announcement had on the prices of the class securities. Initially, we note that it is questionable whether the plaintiffs have sufficiently alleged that they sustained any injury at all from the announcement. All that they have said is that prices dropped on the Monday following the announcement. They have not indicated what call option prices were on November 22, the day that Sperber's options expired, nor what stock prices were on whatever day it was that Halye sold her shares at a loss. It is the latter days, and not Monday, November 17, which are pertinent to the plaintiffs' claim; if the announcement's effect had left the market by the time Sperber's options expired, or Halye sold her shares, then the fact that it allegedly caused a dip in the interim is irrelevant.

But even if the plaintiffs could show that the announcement injured them, they nevertheless would not be able to state a cause of action under RICO.

As the plaintiffs have framed this claim, their alleged injury arises not from the commission of any alleged RICO violation, but rather from the revelation of the commission of a RICO violation. They have not claimed that the alleged pattern of racketeering activities was directed at them, or that it in any way affected them except by virtue of the fact that it was disclosed.[8] An individual cannot state a RICO claim for injuries which admittedly success was based on legal methods rather than on insider trading.

**8.** The plaintiffs do not allege that they held stocks in the corporations which were the subject of the SEC's action against Boesky. Nor do they allege that Boesky engaged in any illegal insider trading with respect to his investments in the class corporations, with one exception. They do characterize as insider trading his sales of his investments in the class corporations with knowledge of the impending SEC announcement. However, as we indicated above, the plaintiffs' position is that they have made no claim with respect to the pre-announcement sales.

did not arise from the commission of the RICO violation but rather from the fact that the violation was disclosed. *See Sedima, S.P.R.L. v. Imrex Company*, 473 U.S. 479, 497, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985) ("Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts."). Indeed, from one perspective, such a claim can be viewed as based not on any violation of the RICO statute, but rather on the fact that the violation was not successful. *See Roeder v. Alpha Industries, Inc.*, No. 85 Civ. 2293-5 (D.Mass. June 18, 1986), *aff'd*, 814 F.2d 22 (1st Cir.1987).

The plaintiffs' argument, that the announcement is not an intervening act which can shield the defendant from liability, is inapposite. The pertinent issue is not whether the announcement interrupts a chain of causation from the commission of the illegal acts which were the subject of the announcement,[9] but whether the announcement itself can serve as an independent basis of liability. In other words, the issue is not whether the announcement can serve as a shield, but whether it can serve as a sword. We hold that it cannot.

The plaintiffs' other claim is that they paid an "artificially" inflated price for their securities. There are several problems with this claim. The most important, however, is that the plaintiffs cannot show that the alleged RICO violation was the proximate cause of their claimed injuries.

■ The RICO statute provides a civil remedy for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c) (1982). This statute has not been interpreted as affording a remedy to every single person who can show that but for a RICO violation, he would not have been injured. Rather, the "by reason of" language in the statute restricts the availability of RICO's treble damages to those who can show that a RICO violation was a proximate cause of their injury. *Haroco, Incorporated v.*

*American National Bank and Trust Company of Chicago*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Hence if the connection between a RICO violation and an injury is too attenuated, the injury cannot be said to have been caused by the RICO violation, and therefore does not confer standing to complain about the violation. *Sedima*, 473 U.S. at 497, 105 S.Ct. at 3286 (citing *Haroco, supra*).

The plaintiffs do not squarely contest the defendant's point that they must show that their alleged injuries were proximately caused by the alleged RICO violation. Rather, they insist that indirect or "cumulative" injuries are recoverable under RICO. We have no quarrel with the proposition that indirect or cumulative injuries may properly invoke the RICO statute. *See e.g., Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467 (8th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1460, 89 L.Ed.2d 718 (1986). However, this proposition does not eliminate the proximate cause requirement. Whether an injury is direct or indirect, the RICO plaintiff must show that it was proximately caused by the alleged RICO violation. *Id.* at 472 (citing language in *Sedima, supra*, in which the Supreme Court cited *Haroco* with approval).

■ The question of proximate cause can be framed in terms of duty. W. Prosser and W. Keeton, Torts § 42 at 274 (W. Keeton, D. Dobbs, R. Keeton, and D. Owen 5th ed. 1984). In other words, we will follow the chain of causation as far as duty extends. Thus whether Boesky's acts were the proximate cause of the plaintiffs' injuries depends on the answer to the question: given the fact that his success was partially ill-gotten, did Boesky owe a duty to protect the plaintiffs from the impact his success allegedly had on the market? We find no basis for such a duty under either of the two theories of liability suggested by the complaint.[10]

---

9. See footnote 2, *supra*, and related text.

10. Nor have the plaintiffs suggested any basis, other than the alleged fact that Boesky's acts

were the cause in fact of their injuries. Their point, apparently, is that the mere fact of actual causation spontaneously generates a duty. It

## CONCLUSION

For all the reasons discussed above, we find that the theories of liability suggested by the complaint are invalid. Consequently "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed. 2d 80 (1957). We therefore grant the defendant's motion to dismiss.

SO ORDERED.

does not. Abiogenesis is a discredited theory in both science and law. *See Wheatley Heights Neighborhood Coalition v. Jenna Resales Company,* 447 F.Supp. 838, 842 (E.D.N.Y.1978) (citing Prosser, Torts § 41 at 236–41 (4th Ed.1971)); *see* *also Diamond v. Reynolds,* No. 84 Civ. 280 (D.Del. Jan. 13, 1986) [Available on WESTLAW, DCT database] (rejecting use of "but for" causation to establish RICO liability).