Raymond P. HAYDEN; Racia Jame Newman; Alan S. Fishbone; David I. Samuels; Hyman Askowitz; Hill Rivkins, Carey, Loesberg, O'Brien & Mulray; Barry Tallering; Tartan Oil Corp.; J. Edwin Carey; Geraldine Bura, Executrix for the Estate of Mark Bura; Burton Trinkoff; Joseph Kandel; Miles R. Ingber; Nat Sorkin; Alan S. Loesberg; Vincent J. Ryan; State Realty Co.; Nathan L. Freedman; Antoinette M. Salinitro, Executrix for the Estate of Nicholas Salinitro; M. John Germain; Murray Wolfkind; AMP Associates; Jame & Jame Management; Harvey Jame; Michael Rosen; Abraham Weissman; Bernard Silver; Neil M. Silverman; Richard Warsoff; Tamp Enterprises; William M. Feingold; Thomas & Cheryl Dowd; Harold Richman; Poles, Tublin, Patestides & Stratakis; Geoffrey A. Mattana; A. Mathew Miller; Daniel Sussman; Harold & Doris Sachs; Morton; Parnes; Jerome Parnes; Kenneth Dorman; Avram Dorman; M. John Germain, Executor for the Estate of Irving A. Germain; Bruce Altman; Harry Leventhal; Andrew Jiritano; Arthur Kaplan; Gordon A.A. & Darlene R. Smith; Jay R. Thalheim; Thomas Kalb; Jack Schuss; Richard David; Seymour S. Kane; Steven Seltzer; Victor Dorman; Estate of R.C. Kopf; Richard Reitman; Friedman & Gabriner Investment Co.; Charles Mueller; Alan Hagler; Herbert Solomon; Michael Solomon; Matsil Associates; Matsil Associates II; Matsil Associates III; Rosemar Associates; Wallace Chavkin; Douglas Leonetti; Fred H. Leonetti; Fred R. Leonetti; Lewis G. Zirkle, M.D.; Harold Friedman; Leighton Wood; Susan Wood; James Berger; Irving Gerstein; Robert Hirsch; Bruce L. Miller; Bruce Miller, II; Barry R. Miller; James A. Duffy; Kenneth M. Kroll; John Kamb; George B. Dewey; Wayne

Clough; Mike Pegram; David Hansen; Steve Johnson; William Moffat; Edward J. Watson, Jr.; Ira C. Yates; Max W. & Pauline E. Dale; Charles Potter; William Dorman; Allan E. Rein; Richard L. Tomasetti; Charles Thornton; Leo Wang; Stanley J. Seren; Leo Schachter; Elliot Tannenbaum; Eric Austein; Joseph E. & Marie T. Manion; Neil Dorman; Marjorie Dorman; Francis J. O'Brien; Sanford Cohen; Martin L. Rein; Irwin Cohen; Ronald P. Erickson; Russel A. Austin, Jr.; Don Gulliford; George Kargianis; John I. Weston, Jr.; and Bernard Forseter; Matthew F. Hogan; John E. Crowther, Eugene Gatti; William A. Sample; John A. Rodgers; T & R. Investments; Dennis Garcelon; Harold Jay Rosenblatt,[1] Plaintiffs,

v.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON and Price Waterhouse, Defendants.

No. 88 Civ. 8048 (JES).

United States District Court, S.D. New York.

Feb. 20, 1997.

1. The above caption duplicates the caption of the Fourth Amended Complaint, which incorrectly spells certain names.

Beigel, Schy, Lasky, Rifkind, Fertik & Gelber, New York City (Bijan Amini, Elizabeth M. Toll, of counsel), for Plaintiffs.

Debevoise & Plimpton, New York City (Edwin Schallert, Fritz Beshar, Michele R.M. Campbell, Julie Brandfield, of counsel), for Defendant Price Waterhouse.

Price Waterhouse, New York City (Erica B. Baird, of counsel), for Defendant Price Waterhouse.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiffs, investors in certain limited partnerships, assert claims against defendant Price Waterhouse ("Price") based upon a primary violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, aiding and abetting violations of the same, common law fraud, negligence, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Price moves for summary judgment dismissing the Fourth Amended Complaint pursuant to Fed.R.Civ.P. 56 and for sanctions pursuant to Fed.R.Civ.P. 11. For the reasons that follow, Price's motion for summary judgment is granted.

## BACKGROUND

In or about 1979, Cralin & Co., Inc. ("Cralin") organized and solicited investments in a series of limited partnerships marketed as tax shelter investments. *See* Affidavit of Jeffrey L. Feldman dated October 26, 1993 ("Feldman Aff.") ¶ 4. Cralin offered these limited partnerships to the investing public with the representation that each partnership would act as a dealer or broker-dealer in various government securities, commodities and options, to provide tax shelters by creating tax deductible ordinary income losses up to four times the amount of capital invested per year while eventually reaping profits from the partnerships' broker-dealer activities.[2] *See* Fourth Amended Complaint ("FAC") ¶¶ 4, 5.

During 1979 and 1980, Cralin's tax shelters took the form of commodities straddles,[3] *see* Feldman Aff. ¶ 4, in which each year Cralin repeated the transactions on an even larger scale to generate proportionally more losses and to postpone investors' realization of the second year's gain in each transaction. *See id.* Plaintiffs allege that the " 'snowball' effect" of Cralin's straddles reached the point by 1981 that it "needed $140,000,000 in losses to offset gains of the previous years' limited partnerships and provide the promised tax write-offs to investors." FAC ¶ 14.

In August 1981, however, Congress enacted the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172 (1981), which eliminated tax recognition of losses attributable to straddle transactions. *See* Economic

---

**2.** Specifically, the Cralin partnerships refer collectively to the following limited partnerships: Securities Arbitrage Company, L.P., Capital Trading Group, L.P., Arbitrage Trading Partners, L.P., Money Market Group, L.P., Capital Futures Group, L.P., Multi–Asset Group, L.P., Cralin Securities Company, L.P., Cralin Metals Company, L.P., and Greystone Investment Group, L.P. *See* FAC ¶ 9.iii.

**3.** In a "straddle" transaction, an investor enters into a pair of forward contracts agreeing to both purchase and sell a specific financial instrument or commodity on a fixed date in the future. *See Kline v. First W. Gov't Sec. Inc.*, 24 F.3d 480, 482 (3d Cir.1994). By taking offsetting positions on the financial instrument or commodity, one phase of the transaction produces a loss while

another phase produces a gain. *See Dewees v. C.I.R.*, 870 F.2d 21, 24 (1st Cir.1989). Where the positions do not precisely offset each other, an opportunity for profit and a risk of loss arise.

The tax rules in effect in 1980 essentially permitted a taxpayer to realize the loss for tax purposes on the position that had decreased in value, by closing out that position and re-establishing a similar but not identical position before the end of the taxable year. At the same time, these tax rules allowed postponement of the recognition for tax purposes of the gain on the position that had increased in value. If the transactions were undertaken in sufficient volume, substantial tax benefits could be produced for investors by accelerating the realization of losses and postponing the realization of gains.

Recovery Tax Act §§ 501–509. Following this amendment, Cralin directed the limited partnerships' investment activities to government securities repurchase agreements[4] as an alternative means to create deductible tax losses for the limited partnerships without reporting or realizing offsetting gains until sometime in the future. *See* FAC ¶ 16. Although market interest rate fluctuations normally create a risk of profit or loss upon the maturity of a repurchase agreement, Cralin allegedly negotiated with New York Hanseatic ("Hanseatic"), a volume trader of government securities, a riskless repurchase agreement whereby Hanseatic created records substantiating certain false transactions by the Cralin partnerships in government securities in support of "the losses needed ... in return for a fee equal to 1% of the losses generated." *Id.* ¶¶ 16, 19, 24.

Plaintiffs allege that since interest rates fell in the latter part of 1981, the repurchase agreement transactions, if subject to ordinary market risk, "would have generated a profit of over $20,000,000 for the Cralin limited partnerships had the partnerships liquidated their repo positions" upon the maturity of the first repurchase agreement. *Id.* ¶ 20. Plaintiffs further allege that, in accordance with its agreement with Hanseatic, Cralin, rather than liquidating the positions, "directed the limited partnerships to hold the T-bills and notes and entered into the second step repos ... thereby preserving their $140 million loss, and eliminating the $20 million gain." *Id.; see also* Feldman Aff. ¶ 12.

In 1982, the Internal Revenue Service ("IRS") reviewed and disallowed certain Cralin tax transactions and corresponding deductions taken by the limited partnerships in 1979, 1980, and 1981. Defendant's Evidentiary Appendix ("Def.Evid.App.") at A1145–1226. The IRS also later raised challenges to the 1982 and 1983 deductions taken by the

limited partnerships. *See id.* at A15–88, A764–65.

The broader securities business that Feldman and his partners attempted to create using the proceeds of their limited partnership offerings was no more successful. Approximately twenty-five percent of the capital raised in the various partnership offerings was immediately consumed by organization costs and syndication fees, including sales commissions. *See id.* at A574, A616, A689, A714–15; Affidavit of Daniel R. Fischel and Kenneth R. Cone dated May 12, 1993 ("Fischel Aff.") ¶ 10. The remaining capital funded the investments in Cralin and the operations of the partnerships. *See* Def.Evid.App. at A689–90, A714–15, A727–29. Cralin used this partnership capital to develop its broker-dealer business, *see* Fischel Aff. ¶¶ 16–20, to dramatically increase its staff from six in 1979, to 250 by the end of 1984, *see id.* ¶ 15; Def.Evid.App. at A1416, A1452, to open nine branch offices, *see* Def.Evid.App. at 1065–70; Fischel Aff. ¶ 16, to become a member on several stock exchanges, *see* Fischel Aff. ¶ 17, to register with the Securities and Exchange Commission and the Commodity Futures Trading Commission, *see* Def.Evid.App. at A746, A749, to acquire a market-making firm on the New York Stock Exchange and another brokerage firm, *see id.* at A1055, A1067–68, A1448, to form merchant banking and venture capital divisions, to act as an underwriter for several offerings, *see id.* at A746–48, A1059–60, and to develop a research department, compliance department, and other support operations, *see id.* at A1056–57, A1414.

The revenues generated by Cralin's brokerage and underwriting activities did not keep pace with the expenses. *See* Fischel Aff. ¶ 19. Cralin's financial statements clearly indicate that from 1979 through 1983, ex-

---

**4.** A repurchase agreement transaction, sometimes referred to as a "repo," involves the purchase and sale of a type of security whereby the seller sells securities, usually government treasury bonds, and agrees to repurchase the same type of securities for a predetermined amount at a later date. *See United States v. Manko,* 979 F.2d 900, 902 (2d Cir.1992). Essentially, this transaction is a loan in the amount of the original sale collateralized by the securities. *Id.* Un-

til the tax law changed in 1984, a dealer in securities was able to deduct the interest payments on this loan, as they accrued, while only reporting gain from appreciation upon the maturity of the security. *Id.* A repurchase agreement transaction could, therefore, give rise to interest deductions which would not be matched by interest income until a subsequent taxable year. *Id.*

penses each year greatly exceeded income. *See* Def.Evid.App. at A253–504. The rent expenditures for Cralin increased from $732,000 in 1982, to $1,418,000 by 1984. *See* Fischel Aff. ¶ 16. Communication costs jumped from $870,000 in 1982, to $2,128,000 in 1984. *See id.* Whereas by 1983, Cralin's total expenses rose to $18.1 million, Cralin generated revenues of $5.1 million. *See id.* ¶ 19. In addition to the heavy expenses, adverse conditions in the securities industry as a whole, particularly in 1984, caused the rapid decline of Cralin. *See id.* ¶¶ 21–25; Def.Evid.App. at A748–49, A1418–19. In an effort to keep afloat, Cralin used investors' capital contributions to cover the exorbitant expenses at a time when the entire industry was experiencing diminishing returns. *See* Def.Evid.App. at A574, A616, A689, A714–15; Fischel Aff. ¶¶ 10, 21–23. In the midst of these adverse conditions, on or about March 1985, Cralin terminated its brokerage operations, laid off 100 employees and ceased operations. *See* Feldman Aff. ¶ 23; Fischel Aff. ¶ 26.

Subsequently, in 1987, all of the Cralin partnerships eventually reached settlements with the IRS which allowed investors to deduct as ordinary losses amounts exceeding their cash investments. *See* Def.Evid.App. at A15–90, A1485–1507. In October 1989, Feldman and Paul Foont, Cralin's designated chief trader, were indicted for their participation in creating and concealing fraudulent income deferral devices aimed at evading taxes for the 1981 tax year. *See United States v. Feldman,* 731 F.Supp. 1189, 1191 (S.D.N.Y.1990).[5]

In or about September 1980, Cralin engaged Price as the accountant for the Cralin corporate entities and limited partnerships to prepare audited financial statements to mail to investors and to include in the partnerships' private placement memoranda ("PPMs"). *See* FAC ¶ 8; Def.Evid.App. at A1391, A599–A622. In or about 1981, Price also became responsible for reviewing and approving each of the PPMs. *See* FAC ¶ 8. In or about 1981, Price prepared, signed, and mailed to the IRS each of the Cralin limited partnerships' tax returns and mailed to the individual investors their K–1 forms in connection with the limited partnerships. *See id.*

Plaintiffs allege that they invested in the various limited partnerships in reliance upon the tax opinions and financial statements issued by Price and the PPMs reviewed by Price which represented that each of the limited partnerships would "act as commodities broker-dealers trading primarily in metals and government-backed securities," *id.* ¶¶ 6, 43, and that plaintiffs would be entitled to declare their share of the partnerships' profits as ordinary income and to deduct any losses under the federal tax laws. *See id.* ¶ 4.

On September 18, 1991, plaintiffs filed the instant Fourth Amended Complaint against the partnership attorneys Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss"), and Price, alleging claims against both defendants for violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, aiding and abetting violations of the same, common law fraud, negligence, and violations of RICO, 18 U.S.C. § 1962(c) and (d). The suits against all of the individual defendants were discontinued by the filing of the Fourth Amended Complaint. By Stipulation and Order dated December 29, 1992, plaintiffs and Paul Weiss settled their respective claims and counterclaims against each other. As a result, Price is the only remaining defendant.[6]

Plaintiffs allege that Price misrepresented and omitted certain material facts in the

---

5. Feldman was indicted by a federal grand jury in 1989 on a number of counts, all of which related to the Cralin 1981 repurchase agreement transactions. *United States v. Feldman,* 731 F.Supp. 1189, 1190–91 (S.D.N.Y.1990). He subsequently pleaded guilty and after being sentenced to two years in prison, he unsuccessfully attempted to withdraw his guilty plea. *See Feldman v. United States,* 1991 WL 35871 at *1 (S.D.N.Y.1991), *aff'd* 978 F.2d 705 (2d Cir.1992).

Thereafter, Feldman filed a motion to reduce his sentence, which was granted by Judge Haight on July 30, 1993. *United States v. Feldman,* 1993 WL 288271 at *3 (S.D.N.Y. Jul. 30, 1993).

6. By Stipulation and Order dated January 13, 1993, plaintiffs agreed to the appointment of thirty bellwether plaintiffs in order to expedite the action and minimize the litigation costs.

audited financial statements of the partnerships and the Cralin corporate entities, which were included in each of the PPMs beginning in 1981. *See* FAC ¶ 43. In particular, plaintiffs allege that Price failed to disclose the riskless nature of the repurchase agreement transactions with Hanseatic, which had no economic profit motive and thus failed to create legal tax losses under the Internal Revenue Code. *See id.* Finally, plaintiffs allege that "[b]y virtue of the fraud, misrepresentations and deceit of [Price], plaintiffs have been damaged in the amount of their investments plus lost use of money invested." *Id.* ¶ 49.

Plaintiffs also claim that Price was instrumental in effecting Cralin's trading program in which Cralin waived $20 million of profit from the repurchase transactions that could have been achieved because of the steep declines in interest rates during the fall of 1981. *See* FAC ¶ 20; Feldman Aff. ¶¶ 7, 12. Plaintiffs allege that Price failed to record these profits because Price was aware of the prearranged nature of the transactions between Cralin and Hanseatic which eliminated any chance of profit or loss. *See* Feldman Aff. ¶ 7. Plaintiffs further claim that Price's misrepresentations, failure to reflect a $20 million profit, withdrawal of their support for the 1981 tax returns, and announcement of its resignation as Cralin's accountant, caused the downfall of Cralin. *See id.* ¶¶ 6–7, 23. Plaintiffs allege that due to the market turnaround in late 1985, Cralin investors would have "profited handsomely" from their interests if not for Price's actions. *See id.* ¶ 24.

As noted above, all plaintiffs, except those investing in Cralin during 1979 through 1980, assert primary and aiding and abetting liability by defendants under § 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5 promulgated thereunder as well as pendent state law claims of common law fraud and negligence. All plaintiffs claim liability under RICO, 18 U.S.C. § 1961 *et seq.* Pursuant to Fed.R.Civ.P. 56(c) and Fed. R.Civ.P. 11, Price moves for summary judg-

ment against plaintiffs' Fourth Amended Complaint and for sanctions.

## DISCUSSION

Summary judgment may be granted only where "there is no genuine issue as to any material fact" and a party is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This Court is not to weigh evidence and decide the truth, but rather to determine whether or not a genuine issue exists for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). To establish a genuine issue of fact, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts," but must come forward with specific facts, by reference to affidavits, depositions, admissions, and answers to interrogatories, "showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Corp., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (quoting Rule 56(e)). Absent such a showing, summary judgment is appropriate since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In this case, plaintiffs concede, as they must, that their aiding and abetting claims under § 10(b) and Rule 10b–5 must be dismissed in light of the Supreme Court's holding in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which was decided after the Fourth Amended Complaint was filed and which held that no private right of action for aiding and abetting exists under § 10(b) and Rule 10b–5. *See Central Bank of Denver,* at 177, 180, 114 S.Ct. at 1448, 1449–50; *see also* Plaintiffs' Letter dated April 28, 1994.

Plaintiffs' primary RICO claims under 18 U.S.C. § 1962(c)[7] must also be

---

**7.** Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate

or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

dismissed because plaintiffs have neither alleged nor presented facts permitting a rational inference that Price participated in the "operation or management" of a RICO enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S.Ct. 1163, 1170, 122 L.Ed.2d 525 (1993); *cf. Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. Plaintiffs allege only that Price misrepresented and omitted material facts in the audited financial statements of the limited partnerships and the Cralin corporate entities, which were included in each of the PPMs from 1981 to 1985; that Price was aware of the prearranged nature of the transactions between Cralin and Hanseatic which eliminated any chance of profit or loss, and failed to disclose the riskless nature of the repurchase agreement transactions with Hanseatic, resulting in a failure to record the $20 million profit; and that Price omitted or misrepresented material facts in preparing and filing tax returns on behalf of the limited partnerships and the Cralin entities between 1981 and 1985, including the K-1 forms mailed to each of the limited partners.

Taken in light of the "operation or management" test of *Reves*, these allegations are clearly insufficient to support a claim that Price participated directly or indirectly or enjoyed some measure of control over the Cralin enterprise. Indeed, it is well established that the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself. *See Reves*, 507 U.S. at 188, 113 S.Ct. at 1175 (finding allegation that accountant's audit reports fraudulently concealed cooperative's insolvency insufficient to establish participation in "operation and management" of RICO enterprise); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521–22 (2d Cir.1994) (holding that provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise conducting the fraudulent transaction); *MCM Partners, Inc.*

*v. Andrews–Bartlett & Assoc.*, 62 F.3d 967, 979 (7th Cir.1995) ("Under the theory advanced in *Reves*, the accounting firm was considered by the Court as an 'outsider' to the enterprise, and ... as outsiders, the accountants had not participated in the operation or management of the cooperative."); *University of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir.1993) (stating policyholders failed to state RICO claim against insurer's independent auditor where claim was based solely upon alleged preparation of false and misleading financial statements for insurer); *Nolte v. Pearson*, 994 F.2d 1311, 1317 (8th Cir.1993) (holding that preparation by attorneys of opinion letters and informational memoranda for RICO enterprise did not constitute participation in "operation or management" of enterprise); *Department of Econ. Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 468–69 (S.D.N.Y. 1996) (accountants fraudulent certification of misleading financial statements in aid of corporation's securities fraud does not constitute participation in operation and management of enterprise for purposes of assessing RICO liability); *131 Main Street Assoc. v. Manko*, 897 F.Supp. 1507, 1527 (S.D.N.Y.1995) (noting that the "operation-or-management rule is intended to spare from RICO liability true enterprise outsiders (such as accounting firms)"); *Morin v. Trupin*, 832 F.Supp. 93, 97–98 (S.D.N.Y.1993) (lawyer's provision of allegedly fraudulent tax opinions and information included in PPM for partnership offering insufficient to establish participation in operation and management of partnership); *Amalgamated Bank of N.Y. v. Marsh*, 823 F.Supp. 209, 220 (S.D.N.Y.1993) (defendant who received false checks and cashed them with knowledge that they were fraudulently obtained by other defendant did not participate in the conduct of enterprise's affairs); *United States v. Altman*, 820 F.Supp. 794, 796 (S.D.N.Y.1993) (executor who embezzled from estate did not participate in operation or management of enterprise); *Strong & Fisher Ltd. v. Maxima Leather, Inc.*, 1993 WL 277205, at *1 (S.D.N.Y. July 22, 1993) (despite defendant's "substantial persuasive power" to influence the enterprise, it is not

---

racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

enough to demonstrate an ability to conduct the affairs of the enterprise). This remains true even if the accountants, such as Price, provided services which were essential to the success of the enterprise. *See De Wit v. Firstar Corp.*, 879 F.Supp. 947, 966 (N.D.Iowa 1995).

Plaintiffs attempt to avoid *Reves* by alleging that Price performed activities in excess of traditional accounting services, including designing and advising Cralin on the alleged unlawful trading activities and reviewing and approving each offering. That argument is refuted by the facts of *Reves* itself, as well as by abundant case authority. *See Reves,* 507 U.S. at 189–90, 113 S.Ct. at 1175 (Souter, J., dissenting) (describing the accounting work, found by majority as insufficient to constitute participation, as transgressing traditional auditing services—"Arthur Young created the very financial statements it was hired, and purported, to audit[,] ... took on management responsibilities by deciding, in the first instance, what value to assign to the Co-op's most important fixed asset.... Arthur Young did indeed step out of its auditing shoes and into those of management, in creating the financial record on which the Co-op's solvency was erroneously predicated"); *see also Arthur Anderson,* 924 F.Supp. at 469 (finding allegations that accountant "creat[ed] financial records and generat[ed] from them the financial statements it purported to audit" insufficient to establish participation) (alterations in original) (citation omitted); *University of Md.,* 996 F.2d at 1539 (defendant accountants did not control enterprise by attending board meetings, providing consulting services, helping to computerize internal accounting functions, and performing valuations necessary for asset sales and acquisitions); *Biofeedtrac, Inc. v. Kolinor Optical Enter. & Consultants,* 832 F.Supp. 585, 593 (E.D.N.Y.1993) ("[E]ven when professionals go beyond their customary role, they will not be deemed to have participated in the 'operation or management' of the enterprise itself.") (citing *Reves,* 507 U.S. at 184 n. 9, 113 S.Ct. at 1173 n. 9); *Chamarac Properties, Inc. v. Pike,* 1993 WL 427137, *3 (S.D.N.Y. Oct. 19, 1993) (accounting firm's professional misconduct and assumption of limited management responsibilities were insufficient to establish § 1962(c) liability).

■ Nor can plaintiffs prevail upon a claim that Price conspired to violate RICO. To establish liability under 18 U.S.C. § 1962(d) for a RICO conspiracy, plaintiffs must prove that Price " 'embraced the objective of the alleged conspiracy,' and agreed to commit two predicate acts in furtherance thereof." *United States v. Viola,* 35 F.3d 37, 43 (2d Cir.1994) (internal quotations omitted). In this case, plaintiffs have cited to no competent evidence of any agreement to commit a pattern of predicate racketeering acts. At most plaintiffs allege that Price was aware of the riskless nature of the repo transactions prior to withdrawing as accountants for the limited partnerships in 1985, and that *Cralin* and *Hanseatic had agreed* to engage in the repo transactions which involved no or minimal risk. (emphasis added). There is not even a scintilla of proof from which to infer that *Price* agreed to enter into those transactions. (emphasis added).

■ Nor is there any proof that Price participated in that alleged conspiracy. The allegation that Price knew of the riskless nature of those transactions is clearly insufficient because knowledge without participation is insufficient to establish membership in a conspiracy. Moreover, even the allegation of knowledge is based upon the circular speculation that Price must have had the requisite knowledge because it was a member of the conspiracy.

Although the Fourth Amended Complaint is unclear as to whether plaintiffs assert a claim of aiding and abetting a RICO violation, assuming arguendo that plaintiffs do assert that claim, it must also be dismissed in accordance with the policies articulated in *Central Bank of Denver,* 511 U.S. 164, 114 S.Ct. at 1441.[8] In *Central Bank,* the Supreme Court noted that the text of the 1934 Act does not extend to those who aid and

---

8. In response to questioning by the Court at Oral Argument, counsel for plaintiffs indicated for the first time that they were asserting aiding and abetting as well as primary RICO claims. *See* Transcript of Oral Argument dated April 1, 1992, at 49.

abet a violation of § 10(b) or Rule 10b–5. *Id.* at 177, 180, 114 S.Ct. at 1448, 1449–50. Because "the text of the statute controls our decision" as to the scope of the conduct prohibited by § 10(b), the Court refused to infer a private right of action for aiding and abetting absent an express statutory creation. *Id.* In doing so, the Court held that the enactment of a statute creating private civil liability for a primary violation of a statute does not give rise to a presumption that such liability extends to aiders and abettors. *Id.* at 182, 114 S.Ct. at 1450–51. Moreover, the Court noted that Congress has not enacted a general civil aiding and abetting statute. *Id.*

Following the reasoning in *Central Bank,* this Court declines to create a private right of action for aiding and abetting a RICO violation. Nowhere in the text of Section 1962 is there any indication that Congress intended to impose aiding and abetting liability for a violation of the RICO statute. Indeed, the only reference to aiding and abetting is found in section 1962(a), which incorporates the general criminal aiding and abetting statute, 18 U.S.C. § 2, with specific reference to the collection of an unlawful debt.[9] Plaintiffs have not alleged that Price in any way violated § 1962(a). Indeed, the reference to Section 2, in that limited connection, cuts strongly against a conclusion that Congress intended to create Section 2 liability for other RICO violations. *See also Department of Econ. Dev.,* 924 F.Supp. at 477 (concluding that no private civil cause of action for aiding and abetting RICO exists).

Nor does RICO's proscription of participation "directly or indirectly" in a RICO enterprise give rise to private civil liability for aiding and abetting. The Court in *Central Bank* noted that § 10(b) and Rule 10b–5 employ the term "directly or indirectly" and expressly rejected the argument that this language creates a private right of action for aiding and abetting. *Central Bank,* 511 U.S. at 176, 114 S.Ct. at 1447–48. The Court reasoned that "aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities *at all,* but who give a degree of aid to those who do." *Id.* (emphasis added). The Court adopted similar reasoning in *Reves. See Reves,* 507 U.S. at 179, 113 S.Ct. at 1170 (requiring affirmative directing of enterprise affairs before imposing RICO liability).

Plaintiffs also argue that since civil liability under RICO turns on whether a criminal violation has occurred, that criminal concepts of aiding and abetting should be construed to be applicable to RICO even if they are not applicable to securities violations. However, this argument, if accepted, would undermine *Central Bank,* since its holding could be circumvented by the simple expedient of alleging a pattern of criminal securities law violations as predicate acts, and based upon that pattern seek to impose civil liability under RICO on the basis of aiding and abetting a RICO violation when, under *Central Bank,* that conduct could not be a basis for civil liability under the securities laws. *See Arthur Anderson,* 924 F.Supp. at 476 (citing *Bowdoin Constr. Corp. v. Rhode Island Hosp. Trust Nat'l Bank,* 869 F.Supp. 1004, 1009 (D.Mass.1994), *aff'd* 94 F.3d 721 (1st Cir.1996)). In any event, since the arguments for inferring aiding and abetting liability under § 10(b) are stronger than in the case of RICO because the common law doctrine of aiding and abetting is presumably more readily applied to a judicially implied

---

**9.** Title 18 U.S.C. Section 1962(a) provides, in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the

activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

Title 18 U.S.C. Section 2 provides:

(a) whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2(a), (b).

cause of action under § 10(b) than a statutory right of action under RICO, the reasoning of *Central Bank* should have even more force when applied to RICO. *See Arthur Anderson*, 924 F.Supp. at 476; *cf. Bowdoin Constr. Corp.*, 869 F.Supp. at 1009; *see also New England Data Serv. v. Becher*, 829 F.2d 286, 291 (1st Cir.1987) ("[W]e certainly do not intend to create two bodies of law by making it easier to bring a charge of racketeering than securities fraud.") [10]

■ Finally, plaintiff's claim for a primary violation of § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, must be also be dismissed because Price has demonstrated an absence of any genuine issue of material fact as to causation. In order to support a 10b–5 claim based solely on material omissions or misstatements, plaintiffs must establish "both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused [plaintiffs] to engage in the transaction in question." [11] *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974) (emphasis added), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44

---

**10.** Plaintiffs rely on several cases which have expressly or implicitly recognized civil liability for aiding and abetting a RICO violation. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir.), *modified on other grounds*, 30 F.3d 1347 (11th Cir.1994), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *Petro–Tech, Inc. v. Western Co. of N. Am.*, 824 F.2d 1349, 1356 (3d Cir.1987); *Standard Chlorine of Delaware, Inc. v. Sinibaldi*, 1994 WL 796603, at *4–5 (D.Del.1994); *Laterza v. American Broadcasting Co.*, 581 F.Supp. 408, 412 (S.D.N.Y.1984). However, these cases are not persuasive because they were decided before *Central Bank*.

Although *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 270 (3d Cir.1995) was decided after *Central Bank* and held that civil aiding and abetting liability could exist under RICO, the court in *Jaguar Cars* did not discuss whether *Central Bank* impacted earlier cases which had found civil aiding and abetting liability under RICO. Similarly, the court in *Tribune Co. v. Purcigliotti*, 869 F.Supp. 1076, 1097 (S.D.N.Y.1994), in denying various motions to dismiss, recognized a civil RICO aiding and abetting claim without considering the impact of *Central Bank*. *See Tribune Co.*, 869 F.Supp. at 1097, *aff'd on other grounds*, 66 F.3d 12 (2d Cir.1995) (1292(b) appeal limited to issue of *Burford* abstention only, and affirming decision not to abstain).

Plaintiffs reliance upon *131 Main Street Associates v. Manko*, 897 F.Supp. 1507 (S.D.N.Y.1995) is also misplaced. In that case, the court held that aiding and abetting a violation of § 10(b) and Rule 10b–5 may constitute predicate acts for a primary RICO violation by those who manage the affairs of a RICO enterprise. *Id.* at 1528–29. The *Manko* court reasoned that even after *Reves*, a person who *operates or manages an enterprise*, but who merely aids or abets the commission of predicate acts, may still be liable for a RICO violation. *See id.* at 1528 n. 17 (emphasis added); *see also Rolo v. City Investing Co. Liquidating Trust*, 845 F.Supp. 182, 230–32 (D.N.J.1994) (only inside directors and certain top officers who participated in the operation or management of the enterprise and who had aided and abetted the commission of at least two predicate acts could be liable under RICO as aiders and abettors), *vacated* 66 F.3d 312 (3d Cir.1994); *Clark v. Milam Co.*, 847 F.Supp. 409, 415 (S.D.W.Va.1994) (§ 1962(c) aiding and abetting claims require showing that defendant participated in the operation and management of alleged enterprise). Nothing in this case suggests that persons who *do not participate* in the operation or management of the enterprise are subject to civil liability merely because they aid or abet predicate acts.

**11.** Section 10(b) of the Securities Exchange Act of 1934 provides, in pertinent part:

It shall be unlawful for any person, directly or ·indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe. . . .

15 U.S.C. § 78j (1994). Rule 10b–5, promulgated thereunder, similarly provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentalities of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1996).

L.Ed.2d 467 (1975); *see also Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir. 1992). Indeed, loss causation, or the equivalent concept of proximate cause,[12] is an essential element of each of the plaintiffs' claims against Price, including plaintiffs' pendent state law claims. *See id.* at 1494–96 (§ 10(b) and common law fraud); *Bennett v. United States Trust Co.,* 770 F.2d 308, 315–16 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986) (§ 10(b) and common law fraud); *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 267, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992) (RICO); *First Nationwide Bank,* 27 F.3d at 769 (RICO); *Sperber v. Boesky,* 672 F.Supp. 754, 758 (1987), *aff'd,* 849 F.2d 60 (2d Cir.1988) (RICO); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (RICO); *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 986 (E.D.N.Y.1988) (negligence cross-claims), *vacated in part by,* 714 F.Supp. 1285 (1989).

In this case summary judgment must be granted because no rational jury could conclude that Price's alleged misrepresentations proximately caused the damage suffered by plaintiffs. To establish proximate cause, plaintiffs must show an adequate nexus between the alleged violative conduct and the injury alleged; *i.e.* "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992); *see also First Nationwide Bank,* 27 F.3d at 769; *Citibank,* 968 F.2d at 1495–96. In sum, to "establish the required causation, the plaintiff[s] must show that the loss was a 'direct result of the defendant's wrongful actions and [that it was] independent of other causes.'" *Bennett,* 770 F.2d at 316 (alteration in original) (quoting *Idrees v. American Univ. of the Caribbean,* 546 F.Supp. 1342, 1350 (S.D.N.Y.1982)).

Ordinarily, loss or transaction causation issues cannot be resolved on a motion for summary judgment. However, in the instant case, summary judgment is warranted because Price has come forward with evidence, in the form of, *inter alia,* Cralin financial statements and the affidavit of Daniel R. Fischel and Kenneth R. Cone, two experts in the securities industry, establishing that the partnerships' closure in 1985 was caused by Cralin's dramatic and costly expansion during an industry slump. Specifically, adverse conditions in the industry during 1984, the year before Cralin dissolved, resulted in a stagnation of growth of new business, a decrease in the volume of initial public offerings and a corresponding decrease in the total profit of broker-dealers by forty-five percent in the United States. *See* Fischel Aff. ¶¶ 21–23; Def.Evid.App. at A748–49, A1418–19; Feldman Aff. ¶ 24. During this period, Cralin was plagued by high expenses, including expenses associated with the formation of the limited partnerships and their large investment in seeking, unsuccessfully, to become a full-service brokerage and investment banking firm. *See* Def.Evid.App. at A574, A616, A689, A714. Accordingly, Cralin's rapid expansion in 1984, despite the downward trend in the industry, resulted in large increases in costs during a time where Cralin's businesses failed to produce enough income to meet

---

**12.** The concept of loss causation has been analogized to the tort concept of proximate cause. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994); *Citibank,* 968 F.2d at 1495; *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 747 (2d Cir.1992); *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 20–21 (2d Cir.1986); *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 708 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980) (citing *Restatement (Second) of Torts* § 548A Cmt. b, illus. 1 (1977)). Loss causation describes the standard rule of tort law whereby a plaintiff must allege and prove that a sufficient causal connection exists between the wrongful act of the defendant and the harm suffered by the plaintiff. *See, e.g.,* *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 685 (7th Cir.), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990), in which Judge Posner opined:

Defrauders are a bad lot and should be punished, but Rule 10b–5 does not make them insurers against national economic calamities. If the defendants' oil and gas ventures failed not because of the personal shortcomings that the defendants concealed but because of industrywide phenomena that destroyed all or most such ventures, then the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages.

*Id.* (citing *Sims v. Faestel,* 638 F.Supp. 1281 (E.D.Pa.1986), *aff'd* 813 F.2d 399 (3d Cir.1987)).

expenses. *See* Fischel Aff. ¶¶ 24–25; *see also First Nationwide Bank*, 27 F.3d at 772 ("when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases."), *cert. denied*, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995).

None of these facts has been disputed and most of them are not even subject to rational dispute. While ordinarily an affidavit of an expert, even if uncontradicted, might still raise an issue of credibility for the fact finder, where, as here, that affidavit is supported by documentary proof and where a jury verdict rejecting that testimony would be rationally unsupported, a motion for summary judgment should be granted. This is especially true since, in the instant case, plaintiffs have produced no evidence at all that any misrepresentations or omissions by Price caused the partnerships to fail. Nor have they contradicted with specific facts Price's well-supported assertion that the Cralin partnerships' inability to return investor capital was due to Cralin's unsuccessful attempt to become a full service brokerage and investment banking firm. *See* Fischel Aff. ¶ 14.

Indeed, plaintiffs' only response is the conclusory claim that "[Price's experts'] conclusion is incorrect." Feldman Aff. ¶ 20. Although plaintiffs assert that "Cralin did, in fact, successfully become a full service brokerage and investment banking firm, prepared to earn significant profits, and only went out of business because of Price Waterhouse's actions," Feldman Aff. ¶ 20, they have failed to elicit any facts establishing that the so-called riskless transactions allegedly concealed from them caused them to lose their unrisked capital.[13] This is especially true because plaintiffs failed to offer any proof that Cralin would have entered into those transactions in the first place had

they involved any risk. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 ("It follows ... that if the factual context renders [plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary."). Indeed, plaintiffs' Fourth Amended Complaint indicates that plaintiffs could not have engaged in these transactions under normal conditions because the amounts involved "far exceeded Cralin's financial capacity to possess the securities or even absorb the risk (assuming no limiting agreements) of the transactions involved." FAC ¶ 20 (parenthesis in original). Furthermore, the undisputed evidence shows that these transactions were entered into only to obtain tax benefits and with the purpose of avoiding any risk of loss or potential profit. "In reality, the Cralin limited partnerships ... were engaged in a complex series of prearranged or rigged transactions which lacked economic merit and which were constructed merely to give the appearance of substantial losses and *without any ability to achieve any economic profit for the partnerships or investors*." *Id.* ¶ 4. (emphasis added).

The Court reserves decision on Price's motion for sanctions, which will be addressed in a separate opinion.

### CONCLUSION

For the reasons stated above, Price's motion for summary judgment is granted, and the Fourth Amended Complaint is dismissed with prejudice. The Clerk of Court is directed to enter judgment accordingly.

It is **SO ORDERED.**

---

13. Plaintiffs' reliance upon *Mendell v. Greenberg*, 927 F.2d 667 (2d Cir.), *amended on other grounds*, 938 F.2d 1528 (2d Cir.1991), is misplaced. In *Mendell*, the shareholders challenged the adequacy of the proxy solicitation seeking approval of a merger on the ground that the fact that the controlling shareholder needed to raise cash quickly in order to pay a large estate tax liability was a material omission resulting in the sale of stock well below its true value. *Id.* at 670. Plaintiffs alleged that this omission of the controlling shareholder's motive would have been a significant factor in a reasonable shareholder's assessment of the recommended course of action. The Second Circuit held only that a rational jury could conclude that the omitted information, if available to the shareholders, might have induced the shareholders to vote against the proposed merger. *Id.* at 674–75. In this case, loss causation was not even an issue.