Howard **SHAMS**; Joseph Shams; Robert Bonnett; Mac Swed, Inc.; Mac Swed, Inc.—Employees Pension Trust Fund; Phyllis Shams; Jeanette Shrem; Alexis Shantz; Ron Hyman; Gary Ginsberg; Elliot Ginsberg; Gertrude Linzer; Judi Bottoni; Phillip C. Bascle; Patsy Searcy; Jo Dweck; Merlin Seuzeneau; Jane Ariel; Evelyn Strouse; James M. Sullivan; Florence Posecai; Carolyn Kinemann; Elizabeth Murphy; Karla Sorenson; Karen Leavitt; and Henry Reinhart, **Plaintiffs**,

v.

Steven **FISHER**; Suri Fisher; Victor Fein; Hyman Fein; Fein Realty Management Corporation; and Winston Barrett Associates, Inc., **Defendants**.

No. 97 Civ. 8214 (CM)(MDF).

United States District Court, S.D. New York.

July 13, 2000.

Kevin E. Maldonado, Pound Ridge, New York, for plaintiffs.

Suri Fisher, Monsey, New York, defendant pro se.

Steven K. Frankel, Frankel Rudder & Lowery, New York City, for Fein defendants.

## MEMORANDUM DECISION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiffs are 26 individuals who invested money in Bellerose Credit Corporation ("Bellerose"), based on their understanding that their investments were to provide secured financing for car loans extended by Bellerose. Defendant Steven Fisher is the sole officer of Bellerose, and the sole owner of Defendant Winston Barrett Associates, Inc., which has been dissolved. Defendant Pro Se Suri Fisher is Steven Fisher's wife. Defendant Hyman Fein is the father of Suri Fisher and Defendant Victor Fein. Hyman and Victor Fein each own 50 percent of Defendant Fein Realty Management Corporation. Plaintiffs allege that each of the individual Defendants engaged in a scheme to defraud them by diverting funds from Bellerose for Defendants' personal use and concealing the diversion of those funds. Before the Court are Plaintiffs' claims under the substantive and conspiracy provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as claims for fraudulent conveyance under New York Debtor and Creditor Law § 273, common law fraud and common law conversion.

All Defendants, except Steven Fisher, who has invoked the Fifth Amendment privilege against self-incrimination in this action, have moved for summary judg-

ment. For the reasons that follow, their motions are granted.

### FACTS

The following facts, which are undisputed except as noted, are viewed in the light most favorable to Plaintiffs.

(1) *Steven Fisher and the Operation of Bellerose*

Defendant Steven Fisher, who is currently the subject of a criminal complaint filed by the United States Postal Inspector, has invoked the Fifth Amendment privilege against self-incrimination in declining to answer Plaintiffs' interrogatories. The Court may therefore draw an adverse inference against him. *See Nabisco, Inc. v. P.F. Brands, Inc.*, 191 F.3d 208, 226 (2d Cir.1999) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318–320, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)).

In or about 1991, Steven Fisher, with the aid of an $85,000 loan provided by his father-in-law, Hyman Fein, purchased Bellerose for approximately $150,000. Through that purchase, Fisher acquired Bellerose's license to finance car loans referred to Bellerose by various car dealerships. At the time Fisher purchased the corporation, Bellerose was one of a small number of finance companies licensed under New York State Banking Law Article XI–B to acquire installment contracts from retail installment sales of motor vehicles. Under this arrangement, consumers seeking to finance purchases of used cars who failed to qualify for conventional financing were referred to Bellerose. Pre-approved consumers were offered the opportunity to enter into a Finance Contract with their car dealer, who in turn would present the Contract to Bellerose for purchase.

Fisher then began to solicit loans from investors, including Plaintiffs. Specifically, each investor was mailed a Loan Agreement, Paragraph 3.1 of which stated that the proceeds of each loan "shall be utilized solely and exclusively [by Bellerose] to finance retail sales contracts," and that the loan proceeds "shall not be utilized by the Borrower for any other purposes, including but not limited to Borrower's operating expenses." (Loan Agreement, attached as Exhibit 1H to Memorandum of Defendant Suri Fisher.)

Fisher also executed Promissory Notes, as President of Bellerose, which he issued to Plaintiffs. The Notes provided that Bellerose was to repay the loan principal after three years with quarterly interest at a rate of 15–18 percent per annum.

In addition to the above-described Notes, from September through November of 1995, Bellerose issued a second series of Notes in a sum of approximately $125,000 with terms to maturity ranging from roughly one year to 18 months ("the Short Term Notes"). Fisher explained to the holders of the Short Term Notes that he was using the proceeds to repay a "certain other lender," and that the term of Plaintiffs' Notes would only be for the balance of the term of the Note, or Notes, of that undisclosed lender.

In total, the 26 Plaintiffs in this action together invested some $650,000 in Bellerose between 1991 and 1995.

The first loan repayments became due in late 1995. Despite repeated demands from Plaintiffs, Fisher refused to pay. Bellerose eventually sent checks to Plaintiffs, but those checks bounced. Fisher promised to send replacement checks and make direct deposits to certain Plaintiffs' accounts, but never did so. He made a number of false statements regarding the delay in repayment, including: (1) his co-signer was away on vacation and the checks could not be issued until the co-signer returned; (2) the Jewish holidays required him to delay issuing the checks; (3) Federal Express had failed to make proper delivery; and (4) Bellerose's bank had erred and returned checks for insufficient funds without justification. Fisher paid accrued interest to some of the Plaintiffs (precisely which of them received these payments is unclear from the rec-

ord), but not principal, which was due on December 31, 1995.

Fisher and Bellerose again failed to make the scheduled quarterly interest payment due on March 31, 1996. Fisher admitted to certain unidentified Plaintiffs that he failed to take the necessary steps to make principal payments to the Plaintiffs, but claimed to have the ability to secure additional funds, either from new investors or bank financing, that would enable him to make the overdue repayments. Fisher also told Plaintiffs that he had set aside sufficient funds to make interest payments, but upon investigation, Plaintiffs discovered that Fisher was listed on "Check Systems," an interbank service used to identify potentially fraudulent customers or accounts, and that Fisher's accounts had been frozen. Fisher told the Plaintiffs that these were bank errors.

Additionally, at an unidentified point in time, Fisher agreed to collateralize loans to unspecified Plaintiffs with privately owned real property. He failed to deliver the title documents as promised, however, and subsequent title searches revealed that the real estate was fully encumbered with liens asserted by other Fisher creditors.

At about the same time, holders of the Short Term Notes contacted the unidentified individual whose Note Fisher claimed to have purchased with the $125,000 raised by the Short Term Notes. That individual's Note, the Short Term Note holders discovered, was for $10,000, not $125,000, as Fisher had told them.

Sometime afterwards, one Plaintiff (who is not identified) noticed that the payee on his check to Bellerose had been changed from "Bellerose Credit Corporation" to "Bellerose Credit Corporation and Steven Fisher."

In early September 1996, Fisher told the Plaintiffs that an undisclosed third party would repurchase the Notes of certain Plaintiffs, but withdrew the offer when Plaintiffs demanded an escrow.

On July 1, 1996, a group of Bellerose investors filed an involuntary petition for relief against Bellerose under Chapter 7 of the United States Bankruptcy Code. On September 20, the Debtor consented to the Order for Relief, and exercised its right under Code Section 706(a) to convert the involuntary proceeding to a case under Chapter 11 of the Code. In the course of that proceeding, Fisher submitted a false statement of assets and net worth of Bellerose to the Bankruptcy Court. Specifically, the statement represented that Bellerose maintained assets, in the form of secured loans, despite Fisher's knowledge that those loans had already been illegally converted to personal assets and no longer represented Bellerose's net worth.

At some point (that Plaintiffs do not specify) during the course of the bankruptcy proceedings, Fisher transferred title to a house that he owned in Rockland County from himself to Suri. According to Hyman Fein, neither Steven nor Suri ever lived in the Rockland County house, but rather, have lived in the same house with Hyman and his wife since 1993 or thereabouts. (Hyman Fein Dep. at 5–7.) Plaintiffs allege that Hyman Fein notarized certain documents in connection with the transfer of title, but Hyman testified that he did not recall doing so. (Id. at 7.)

### (2) *Suri Fisher*

Suri Fisher's role at Bellerose was far less than was her husband's, although she clearly did some work for the company. Plaintiff Ron Hyman testified that, prior to Bellerose's bankruptcy, he saw Suri typing and answering phones on one occasion when he was in the Bellerose offices. (Ron Hyman Dep. at 14–15.) The parties dispute whether Suri Fisher solicited loans to Bellerose; however, the only evidence cited by Plaintiffs is the testimony of Plaintiff Jo Dwek, who said that Suri Fisher "made clear that [Bellerose] was a good investment" and told Dwek that "her sisters had invested and they're doing very well." (Jo Dwek Dep. at 14.)

After Bellerose was placed in bankruptcy, Suri contacted a friend, Michelle Brander, asking Brander to recommend an accountant "for the company" to "look at books and records." (Suri Fisher Dep. at 45–47.) Brander gave her the name of Don Fuchs, whom Bellerose hired. Suri then called Fuchs, although she testified that her husband was the one who hired him. (Id. at 53.) Suri also testified that Fuchs contacted her regarding payment of his bill for services rendered to Bellerose, and that she was the one who paid Fuchs. (Id. at 54, 57.)

Suri was also aware that Fuchs "never did a formal investigation," but merely "did a brief investigation" of Bellerose's finances. (Id. at 58.) Fuchs reported the results of that investigation to Suri while her husband was in the hospital. (Id.) Suri, together with her husband, attended at least two meetings with Fuchs in Bellerose's offices. At the second of these, Fuchs told the Fishers that the bank accounts of Bellerose had been fully depleted. (Id. at 51.) Suri also testified that, after her meetings with Fuchs, she concluded that Bellerose was paying "too high of an interest rate" to its creditors. (Id. at 43–44.)

Suri acknowledges that she was involved in the selection of Kevin Nash as the attorney to represent Bellerose in its bankruptcy proceedings. (Id. at 100.) Suri testified that she and her husband met with Nash at least twice; she "thinks" that she met with Nash more than twice. (Id. at 101.) Nash prepared a listing of Bellerose's assets and liabilities that was filed with the bankruptcy court. Suri stated that she reviewed the listing, though she testified that she "thinks" she reviewed it in the courthouse after it had been filed, rather than beforehand. (Id. at 102.)

With respect to the transfer of title to the Rockland County house, Suri testified that she took title to property at the suggestion of Shalom Fogel, a mortgage broker. Suri claims that title was transferred so that she could obtain financing, but she also acknowledged that she had no income and an outstanding car loan. (Id. at 108–09.) She testified that Fogel agreed to serve as mortgagee, but that she did not go through with the transaction because she "got tired." (Id. at 110.)

According to Suri, the legal aspects of the transfer were handled by a Mr. Manzines, whom Suri had known about as her brother Alan's attorney. She "guesses" that she paid Manzines' bill, but had no recollection of doing so. (Id. at 111.) She further testified that she has no copies of the transfer documents, and does not know where they are to be found, because she "never paid attention to them," but "thought [Manzines] gave them to the courthouse." (Id. at 112.) She denies ever having received a copy of the documents from Manzines. (Id.)

### (3) Fein Realty, Victor Fein and Hyman Fein

Victor and Hyman Fein, Suri Fisher's brother and father respectively, are each 50 percent owners of Fein Realty Management Corporation. Bellerose retained Fein Realty to perform bookkeeping services, which included writing checks for interest payments to Bellerose creditors, checks to the Department of Motor Vehicles, and checks to Fein Realty for its fees. Additionally, both Victor and Hyman notarized loan documents for Bellerose. (Victor Hyman Dep. at 14.) Fein Realty charged Bellerose a monthly fee of five dollars on each car leased by Bellerose.

Victor Fein testified that checks from Bellerose investors were not sent to Fein Realty. He also testified that Fein Realty did not keep track of funds in the Bellerose accounts, and that he never knew whether there was money in Bellerose's accounts to cover the checks that Bellerose instructed Fein Realty to write. (Id. at 15.)

Hyman Fein testified that he invested $85,000 in Bellerose, and that despite his requests to Steven Fisher, that sum was

never repaid. (Hyman Fein Dep. at 21, 25.) However, on December 20, 1995, Steven Fisher wrote a check from his personal account to Fein Realty for $ 10,000. Additionally, on February 26, 1996, Steven Fisher wrote a check payable to Hyman Fein in the amount of $7,000.

### (4) *The Present Action*

Plaintiffs filed the instant suit on November 5, 1997. Their complaint included the following claims: (1) violation of RICO § 1962(c) and (d) against all Defendants; (2) violation of RICO § 1962(b) against all Defendants; (3) fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), against Defendants Steven and Suri Fisher; (4) common law fraud against Defendants Steven and Suri Fisher; (5) fraudulent conveyance under New York Debtor and Creditor Law § 273 against all Defendants; and (6) common law conversion against all Defendants. Plaintiffs seek compensatory and punitive damages on all claims, as well as treble damages as provided under RICO.

On May 18, 1998, the Defendants moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). This Court referred the Defendants' Motions to Dismiss to Magistrate Judge Mark Fox for Report and Recommendation. In his R & R dated March 3, 1999, Judge Fox recommended dismissal of Plaintiffs' second and third causes of action. In a Memorandum Decision dated March 31, 1999, this Court accepted Judge Fox's Report and Recommendation. Thus, the only remaining claims on summary judgment are Plaintiffs' first, fourth, fifth, and sixth causes of action. Before the Court are the motions for summary judgment of all Defendants, except Steven Fisher, on all remaining claims.

### CONCLUSIONS OF LAW

*Standard for Summary Judgment*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### (1) *Substantive RICO Claims— § 1962(c)*

Although Plaintiffs assert substantive RICO claims under § 1962(c) against all Defendants, Plaintiffs' legal argument in their memorandum of law in opposition to summary judgment fails to differentiate between their claims under § 1962(c), their RICO conspiracy claims under § 1962(d), and their claims under state law. It appears that Plaintiffs' scattershot argument is addressed solely to Suri Fisher's and the Fein Defendants' liability for RICO conspiracy. Nevertheless, I analyze their substantive RICO claims under § 1962(c).

To make out a claim for violation of § 1962(c), a plaintiff must establish that he was injured by the defendant's (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 242 (2d Cir.1999) (citation omitted). In this case, Plaintiffs allege the existence of an enterprise formed for the purposes of defrauding them of their investments in Bellerose and concealing the illicit transfer of those investments from corporate to personal assets.

RICO defines "racketeering activity" as including several enumerated criminal offenses under federal and state law. *See* 18 U.S.C. § 1961(1). Here, Plaintiffs allege the following acts of racketeering: (1) mail fraud in violation of 18 U.S.C. § 1341, consisting of: the mailing to each Plaintiff of a Loan Agreement fraudulently stating that all loan proceeds "shall be utilized solely and exclusively [by Bellerose] to finance retail sales contracts" and not for any other purpose; and the mailing of letters on two occasions by Steven Fisher to Plaintiff Howard Shams setting forth fraudulent quarterly interest schedules;[1] (2) submission of a false statement of assets to the bankruptcy court; and (3) fraudulent conveyance of the Fisher home after Bellerose filed for bankruptcy.[2] *See* 18 U.S.C. § 1961(1)(B), (D). Plaintiffs' remaining claims against Defendants—common law fraud and conversion—are not acts of racketeering activity under RICO. *See* § 1961(1). Thus, the predicate acts alleged can be divided into acts relating to the fraudulent solicitation of Plaintiffs' investments in Bellerose between 1991 and 1995 (i.e., mail fraud), and acts following Bellerose's bankruptcy filing (i.e., submission of a fraudulent statements of assets and fraudulent conveyance).

A "pattern of racketeering activity" under RICO requires "at least two acts of racketeering activity" committed within the span of ten years. *See* § 1961(5).

Moreover, the plaintiff must demonstrate that those acts relate to each other (i.e., "horizontal relatedness"), and that the acts relate to the enterprise (i.e., "vertical relatedness"). *See United States v. Muyet,* 994 F.Supp. 501, 508 (S.D.N.Y.1998) (citing *United States v. Long,* 917 F.2d 691, 697 (2d Cir.1990)). "[T]wo racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise." *United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.1989).

Additionally, to be liable under § 1962(c), a defendant must have participated in the "management or control" of the enterprise. *See Napoli v. United States,* 45 F.3d 680, 682 (2d Cir.), *cert. denied sub nom. Rella v. United States,* 514 U.S. 1084, 115 S.Ct. 1796, 131 L.Ed.2d 724 (1995) (citing *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)). Under this standard, "[a]n enterprise is 'operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." *Reves,* 507 U.S. at 184, 113 S.Ct. 1163. "As interpreted by courts in this district and others, the 'operation and management' test ... is a very difficult test to satisfy." *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1090 (S.D.N.Y.1996). There exists a "substantial difference between actual con-

---

**1.** In their Complaint, Plaintiffs also alleged violations of the federal wire fraud statute, 18 U.S.C. § 1343, but as this Court observed in its Memorandum Decision and Order dated March 31, 1999, Plaintiffs failed to plead wire fraud with sufficient particularity under Fed. R.Civ.P. 9(b). Plaintiffs have neither amended their Complaint to cure this pleading defect nor adduced any evidence that any of Defendants used the wires to defraud them.

**2.** Although Plaintiffs state in their memorandum of law that their claims of bankruptcy fraud and fraudulent conveyance constitute racketeering activity for purposes of § 1961(1), they have neglected to identify a relevant statutory provision in either their Complaint or memorandum of law. The

Court presumes that Plaintiffs are alluding to the bankruptcy fraud statute, 18 U.S.C. § 152, which provides in pertinent part:

A person who—

. . .

(2) knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;

. . .

(5) knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;

. . .

shall be fined under this title, imprisoned not more than 5 years, or both.

trol over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves* because 'the test is not involvement but control.' " *Dept. of Economic Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 466 (S.D.N.Y.1996) (citation omitted).

#### (a) *Suri Fisher*

In support of their claims against Suri Fisher (under both RICO and state law), Plaintiffs point to the following: (1) the testimony of Plaintiff Ronny Hyman that, on an unspecified number of occasions when he visited the Bellerose office prior to the bankruptcy, he saw Suri Fisher typing and answering the telephone; (2) the testimony of Plaintiff Jo Dwek that Suri "made it clear that [Bellerose] was a good investment" and told Dwek that "[Suri's] sisters had invested and they're doing very well"; (3) the fact that Suri hired and assisted the accountant who audited the Bellerose books, from which Plaintiffs reason that she must have had knowledge of the falsity of the statement of assets submitted to the bankruptcy court; and (4) the timing of the transfer of title to the Fisher home from Steven to Suri, which Plaintiffs contend indicates an attempt by Suri to shield assets from Steven's creditors.

None of these facts would permit a reasonable juror to infer that Suri was a high-ranking participant in the fraud perpetrated on Bellerose investors between 1991 and 1995. But, as the Supreme Court noted in *Reves*, lower-level participants may also be deemed participants in the operation or control of a RICO enterprise in certain circumstances.

As the Second Circuit has observed, *Reves* left unanswered the question of "whether such lower-rung participants must themselves play some 'direct[ing]' role, or need only be acting under the direction of upper management." *See United States v. Allen*, 155 F.3d 35, 42 (2d Cir.1998). In a number of recent cases, that Court has addressed the question of precisely how far down the ladder of control § 1962(c) liability may extend.

In *Allen*, Judge Newman observed that "[i]n most of the cases in which we have held lower level employees to be RICO participants, the defendant was shown to have played some management role in the enterprise." *Id.* at 42 (citations omitted). For example, in *Napoli*, the Second Circuit determined that the defendants—investigators working under instructions from attorneys in their firm to bribe witnesses and falsify evidence supporting tort claims—participated in the operation or management of the scheme. Even though they were not acting in a managerial capacity, the Court noted, they "exercised broad discretion" in "carry[ing] out instructions from the law firm principals." *Allen*, 155 F.3d at 42 (citing *Napoli*, 45 F.3d at 683).

Similarly, in *United States v. Wong*, 40 F.3d 1347 (2d Cir.1994), *cert. denied*, 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 127 (1995), at least two of the lower level employees whose convictions were upheld had "significant managerial roles:" one "moved up the ladder and began planning crimes," while the other "helped organize" in an effort to locate witnesses who had identified him as a shooter. *See Allen*, 155 F.3d at 42 (citing *Wong*, 40 F.3d at 1374).

From these cases, the Second Circuit extracted the principle that "[u]nless a civil RICO defendant is indisputably directing the affairs of the enterprise, his commission of crimes that advance its objectives must be assessed by a fact-finder to determine whether or not his criminal activity, assessed in the context of all the relevant circumstances, constitutes participation in the operation or management of the enterprise's affairs." *Allen*, 155 F.3d at 42.

According to the parameters set by the Second Circuit, Plaintiffs' evidence is not sufficient to raise a triable issue as to Suri under § 1962(c). That Suri was present in the Bellerose office typing and an-

swering telephones and made certain positive statements about Bellerose to Jo Dwek do not support an inference that she participated in the operation or management of the scheme to defraud Bellerose investors or acted at the direction of Bellerose management in carrying out such acts, much less that she exercised anything comparable to the "broad discretion" identified in Second Circuit case law. *See United States v. Viola*, 35 F.3d 37, 40–41 (2d Cir.1994) (The "simple taking of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)."); *LaSalle Nat'l Bank*, 951 F.Supp. at 1090 ("[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result") (quoting *University of Maryland v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir.1993)).

Indeed, courts in this circuit have declined to impose § 1962(c) liability upon defendants who, unlike Suri Fisher, not only were shown to have had knowledge of the criminal nature of the RICO enterprises that they served, but also performed tasks far more integral to those enterprises than did Suri here. In *Viola*, the Second Circuit, relying on *Reves*, reversed the conviction under § 1962(c) of one of the defendants in a drug and stolen property importation and distribution ring. *See Viola*, 35 F.3d at 43. The defendant, a warehouse maintenance man, was found to have transported stolen beer and lamps to buyers and returned most of the proceeds to the ring's kingpin, but had no other involvement with the enterprise; he was not consulted in the decision-making process and exercised no discretion in carrying out orders. *See id.* at 43. Thus, the Second Circuit concluded, the defendant "simply did not come within the circle of people who operated or managed the enterprise's affairs." *Id.See also Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191, 1997 WL 603496, *5 (S.D.N.Y. Sept.30, 1997) (allegations that defendants in insider trading

scheme passed along and traded on inside information and received kickbacks for illegal trades, without more, insufficient to state claim under § 1962(c)).

Nor have Plaintiffs raised a triable issue based on Suri's participation in the alleged post-bankruptcy predicate acts. Plaintiffs argue that Suri's participation in the predicate act of bankruptcy fraud is evidenced by her admission that she hired and worked with the accountant who audited the records of Bellerose after the operation was forced into bankruptcy. From this, Plaintiffs reason that Suri "must have had the requisite knowledge of the falsity of the statement submitted in the bankruptcy court" (Pl.Br. at 4), thus indicating her role in the management of the Bellerose scheme. In fact, Suri's testimony—the only evidence submitted by Plaintiffs of her alleged participation in bankruptcy fraud—is far less compelling than Plaintiffs suggest. Specifically, Suri testified as follows:

Q. Have you every reviewed [the] listing of assets and liabilities?

A. In the courthouse.

Q. Was that before or after it was filed with the court?

A. I think it was after.

Q. Who gave you a copy of the listing of the assets and liabilities of Bellerose?

A. I was never given a copy.

Q. How did you come to see it in the courthouse?

A. I think Kevin showed it to me.

Q. Kevin Nash [Bellerose's attorney]?

A. Yes.

Q. Did he show it to you or did he show it to you and ask you to review it?

A. He didn't put much into it. It had nothing to do with me.

. . . .

(Fisher Dep. at 102.) This evidence falls short of raising a material question of fact as to whether Suri knowingly made or

participated in making a fraudulent statement to the bankruptcy court.

■ But even if Plaintiffs' evidence did raise a triable issue of Suri's participation in bankruptcy fraud, it would still not suffice under *Reves* for Plaintiffs' § 1962(c) claims against her to withstand summary judgment. The fact that, after Bellerose was placed in bankruptcy, Suri hired and met with the accountant who audited the Bellerose accounts does not suggest that she operated or managed the overarching scheme to defraud Bellerose investors and conceal that fraud. It is not sufficient for liability under § 1962(c) that a defendant controls "fraudulent activity that is ancillary to the fraud carried out by the RICO enterprise." *Dept. of Economic Dev.*, 924 F.Supp. at 467.

■ That leaves Suri's role in the allegedly fraudulent conveyance of the house in Rockland County as a predicate act. Even assuming *arguendo* that Plaintiffs have raised a triable issue on this point, one racketeering act is insufficient to satisfy RICO's pattern requirement. *See* 18 U.S.C. § 1961(5). Accordingly, Plaintiffs § 1962(c) claims against Suri Fisher are dismissed.

#### (b) *The Fein Defendants*

In their memorandum of law, Defendants have abandoned their § 1962(c) claims against the Fein Defendants, stating that their RICO allegations against those Defendants "sound in RICO conspiracy under § 1962(d)." (Pl.Br. at 3.) Plaintiffs' substantive RICO claims against the Fein Defendants under § 1962(c) are therefore dismissed as well.

#### (2) *RICO Conspiracy—§ 1962(d)*

■ 18 U.S.C. § 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To make out a claim for RICO conspiracy, a plaintiff must prove "the existence of an agreement to violate RICO's substantive provisions."

*Cofacredit*, 187 F.3d at 244 (citation omitted). This burden is satisfied if the plaintiff demonstrates that the defendants "know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual roles." *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir.2000) (quoting *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.), *cert. denied sub nom. Agar v. United States*, 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989)). Stated differently, the dispositive question under § 1962(d) is "whether an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise.'" *Id.* (quoting *Viola*, 35 F.3d at 44–45).

#### (a) *Suri Fisher*

■ Plaintiffs' evidence is insufficient to sustain their RICO conspiracy claims against Suri Fisher. Suri's presence in the Bellerose office on occasion (unspecified as to how frequently), typing and answering telephones before the bankruptcy, is inadequate to support an inference that Suri agreed to further the objectives of the Bellerose scheme or knew what her husband was "up to." Nor would those facts, standing alone, allow a reasonable juror to conclude that Suri's activities at Bellerose would have led her to believe that she was part of a larger enterprise extending beyond her limited clerical role. This is particularly so in view of the absence of any information in the record about the subject matter of Suri's activities in the Bellerose office.

■ Similarly, Jo Dwek's testimony does not raise a question of fact as to whether Suri conspired to defraud Bellerose investors. Dweck's testimony does not suggest that Suri solicited her to invest; in fact, Dwek testified that Suri's characterization of Bellerose as a "good investment" came in response to a question from Dwek about Bellerose as a prospective investment, rather than as a solic-

itation initiated by Suri. (Dwek Dep. at 15.) And though Dwek also testified that she came to invest in Bellerose "through [her] relationship with Suri, she made it clear that it was a good investment" (id. at 14), Plaintiffs have adduced no evidence to suggest that Suri knew that Bellerose was a fraudulent operation when she made this statement to Dwek.

The other two predicate acts alleged—submission of a false bankruptcy statement and fraudulent conveyance—took place after the fraudulent solicitation of Plaintiffs' investments, which ended in 1995. With respect to those alleged post-bankruptcy acts, Plaintiffs contend that the timing and circumstances of the transfer of title to the Rockland County house from Steven to Suri raises a material issue of fact as to Suri's role as a conspirator. Specifically, Plaintiffs note Suri's testimony that she took title in order to refinance the $450,000 mortgage on the property, despite her later testimony that she had no income and a negative credit rating. (Fisher Dep. at 108–09.) But the fact that Suri may have participated in a fraudulent conveyance of the Fisher home does not raise a material question as to whether Suri knew the broader nature of her husband's scheme to defraud Bellerose investors or whether she would have been led to suspect that her alleged role in the conveyance was part of a larger enterprise.

Finally, Plaintiffs argue that Suri's alleged knowledge of the contents of Bellerose's false statement of assets presents a triable issue of her role in a RICO conspiracy—the same contention they made in connection with their substantive RICO claims against her. For the reasons discussed above, Plaintiffs have failed to raise a material question as to Suri's knowledge of the falsity of that statement. And even if they had, Suri's role in the post-bankruptcy submission of an untrue asset statement to the bankruptcy court does not admit of an inference that she entered into an agreement to defraud Bellerose investors prior to the company's bankruptcy.

Plaintiffs RICO conspiracy claims against Suri Fisher are therefore dismissed.

### (b) Hyman Fein

Plaintiffs point to the following as evidence of Hyman Fein's role in the alleged conspiracy: (1) the close relationship between all Defendants, who are related and lived in the same house at the time of the fraud; (2) the fact that at his deposition Hyman Fein denied having received repayment for his $85,000 investment in Bellerose, even though he received a $10,000 check from Steven Fisher shortly after Fisher made a transfer of funds from Bellerose to his personal account; (3) the fact that Hyman Fein notarized loan documents for Bellerose and the documents transferring title of the Rockland County house to Suri; and (4) his receipt of the fraudulent bankruptcy statement, which listed his loan to Bellerose at an inflated amount, and subsequent failure to notify the bankruptcy court.

With respect to the fact that Hyman Fein lived in the same house with Steven and Suri Fisher, I note that, even in the criminal context, "[m]ere presence at the scene and close association with those involved are insufficient factors alone" from which a reasonable juror may infer a conspiracy. See United States v. Sanchez, 961 F.2d 1169, 1174 (5th Cir.), cert. denied, 506 U.S. 918, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992) (citing United States v. Simmons, 918 F.2d 476, 484 (5th Cir.1990)). "[N]evertheless, they are relevant factors for the jury." Id. See also United States v. Zhang, 833 F.Supp. 1010, 1020 (S.D.N.Y.1993) (mere facts that conspiracy defendant lived in same house and worked in same office as co-defendant insufficient to avoid motion to dismiss charges). Thus, although Hyman's cohabitation with Steven Fisher alone is not sufficient to allow the question of his role as a conspirator to reach a jury, I consider it along with Plaintiffs' other evidence.

Hyman Fein's role as a notary for Bellerose and Steven Fisher cannot support an inference that he was a conspirator. As the Fein Defendants correctly note, a notary's duty in New York consists of attesting to the authenticity of writings in order to render them available as evidence of the facts therein contained. *See* 1 N.Y.Jur.2d Acknowledgments, Affidavits, Oaths, Notaries, and Commissioners § 66 (1979). Plaintiffs have offered no evidence that Hyman Fein reviewed or had knowledge of the contents of any of the Bellerose documents presented to him for notarization, and, as the Fein Defendants note, no documents were presented at his deposition for his review or to elicit his recollection.

As for their argument that Hyman was aware of an allegedly fraudulent bankruptcy statement, Plaintiffs have failed to offer any evidence that Hyman saw the statement of Bellerose assets submitted to the bankruptcy court. When asked at his deposition whether he had seen or been sent a copy of the document, he responded that he could not recall (Hyman Fein Dep. at 36), and Plaintiffs have not included a copy of the statement in the record. I therefore reject this argument as well.

Plaintiffs raise a closer question when they argue that certain checks written by Steven Fisher to Hyman Fein, his wife Miriam and Fein Realty support an inference of Hyman's participation in a conspiracy with Steven Fisher. This inference is buttressed, Plaintiffs contend, by Hyman's denial, under oath, that he received any payments from Bellerose apart from interest payments on his loan—a statement Plaintiffs contend is contradicted by the checks it has produced in the record. Specifically, Hyman testified as follows:

> At some point in time, did Mr. Fisher fail to make payments on the $85,000?
>
> A. Yes.
>
> . . .
>
> Q. Was any portion of the $85,000.00 that you owed [sic] to Belrose [sic] repaid?
>
> A. I don't believe so.
>
> . . .
>
> Q. Did you receive any other payment from Belrose?
>
> A. No.
>
> . . .
>
> Q. Have you ever received any checks from Steven Fisher personally?
>
> A. Not that I can recall.
>
> . . . .

(Hyman Fein Dep. at 24–27.) However, Hyman later testified that he received "some" interest payments on the loan. (Id. at 34.)

Plaintiffs have submitted copies of checks reflecting the following payments from Bellerose and Steven Fisher to Hyman and Miriam Fein and Fein Realty:

| Date | Payor | Payee | Amount |
| --- | --- | --- | --- |
| 4/1/94 | Bellerose | Hyman Fein | $ 3,526.88 |
| 4/22/94 | Bellerose | Fein Realty | 620.00 |
| 5/2/94 | Bellerose | Fein Realty | 624.00 |
| 6/9/94 | Bellerose | Fein Realty | 656.00 |
| 7/1/94 | Bellerose | Hyman Fein | 3,526.88 |
| 7/12/94 | Bellerose | Fein Realty | 668.00 |
| 7/18/94 | Bellerose | Miriam Fein | 4,252.00 |
| 8/10/94 | Bellerose | Fein Realty | 708.00 |
| 9/19/94 | Bellerose | Fein Realty | 728.00 |
| 10/1/94 | Bellerose | Hyman Fein | 3,526.88 |
| 10/11/94 | Bellerose | Fein Realty | 680.00 |
| 1/1/95 | Bellerose | Hyman Fein | 3,526.88 |
| 2/8/95 | Bellerose | Fein Realty | 612.00 |
| 2/10/95 | Bellerose | Miriam Fein | 12,000.00 |
| 3/20/95 | Bellerose | Fein Realty | 572.00 |

| Date | Payor | Payee | Amount |
|------|-------|-------|--------|
| 4/1/95 | Bellerose | Hyman Fein | 3,526.88 |
| 4/12/95 | Bellerose | Fein Realty | 544.00 |
| 6/15/95 | Bellerose | Fein Realty | 1,000.00 |
| 12/20/95 | Steven Fisher | Fein Realty | 10,000.00 |
| 2/?/96 [Illegible] | Steven Fisher | Fein Realty | 10,000.00 |
| 2/26/96 | Steven Fisher | Hyman Fein | 7,000.00 |
| 3/27/96 | ? [Unidentified] | ? Fein [Illegible] | 10,000.00 |
| 12/29/97 | Victor Fein | Hyman Fein | 10,000.00 |

Plaintiffs argue that all of these checks raise a triable issue as to Hyman's role as a conspirator in the enterprise.

■■■ The checks can be divided into four groups: (1) payments from Bellerose to Hyman Fein every three months in the amount of $3,526.88; (2) payments from Bellerose to Fein Realty in amounts ranging from $544 to $728; (3) the check from Bellerose to Fein Realty in the amount of $1,000 dated June 15, 1995; (4) the checks from Steven Fisher personally to Hyman Fein or Fein Realty or from Bellerose to Miriam Fein.

The first group of checks consists of checks from Bellerose to Hyman Fein at regular intervals in identical amounts— $3,526.88 on the first of the month every three months—as provided under the terms of the Notes issued to Bellerose investors, and consistent with Hyman's testimony that he received interest payments from Bellerose on his $85,000 investment. In view of Plaintiffs' failure to submit evidence suggesting that these payments represented anything other than interest payments, the checks in this first group do not present a triable issue with respect to whether Hyman conspired with Steven Fisher to operate Bellerose as a racket or conceal the proceeds therefrom.

The second group of checks includes ten smaller payments from Bellerose to Fein Realty, ranging in amounts from $544 to $728. Again, Plaintiffs submit no evidence about what these checks are or might be, and the only evidence in the record on this question is that Fein Realty was paid modest amounts—specifically, $5 per car leased by Bellerose—for its bookkeeping

services to Bellerose. Absent any proof to the contrary, this group of payments is also not adequate to support an inference that Hyman was engaged in a conspiracy with Steven Fisher.

The remaining checks, however, include payment amounts that vary significantly from the others. Together, the payments add up to the not insubstantial sum of nearly $55,000. There is a paucity of information from either Plaintiffs or the Fein Defendants regarding the nature of these payments; in particular, Hyman Fein has submitted no evidence to show what those checks represent. I do note, however, that the amount paid is less than the amount of the $85,000 loan made by Hyman Fein to Bellerose.

The question before me is whether the existence of these checks, taken together with Hyman Fein's presence in the Fisher home, would support an inference that Hyman conspired with Steven to operate Bellerose in violation of federal racketeering laws. I conclude that it does not. There is no evidence in the record of any agreement between Hyman and his son-in-law, or of any involvement by Hyman in Steven's business. The fact of the payments is not sufficiently suspicious, in view of the outstanding loan from Hyman to Bellerose, to support an inference of conspiracy—even though some of the checks were written to Miriam (not the lender) and by Steven (not the borrower). The only reasonable inference that can be drawn from the totality of the circumstances is that Steven favored his wife's parents over his other lenders in terms of repaying his many outstanding loans. That does not suffice to enable a jury to conclude that Hyman agreed with Steven

to run Bellerose as a racket, or to conceal the fruits of that racket.

### (c) *Victor Fein and Fein Realty*

Finally, Plaintiffs argue that liability against Victor Fein and Fein Realty as RICO conspirators may be inferred from the following: (1) that Victor Fein performed bookkeeping functions for Bellerose; (2) that Victor Fein signed a number (Plaintiffs do not specify what number) of the checks payable from Bellerose to Fein Realty and Hyman Fein; (3) the fact that Fein Realty received a $10,000 payment directly from Steven Fisher; and (4) the fact that many of the checks (again, unidentified by Plaintiffs) to Fein Realty were issued at a time when Bellerose had no automobile loans outstanding, and "presumably very little need for administration." (Pl.Br. at 8.)

With respect to this last argument, Plaintiffs have neither identified specifically which checks were issued during a period when Bellerose had no need for Fein Realty's services, nor provided any evidence that Bellerose's accounts no longer needed administration after a certain point in time. Instead, they rely solely on the vaguely-described "presumption" articulated in their memorandum of law. This is not sufficient to withstand Plaintiffs' motion for summary judgment. *See Delaware & Hudson Railway v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) ("Conclusory allegations will not suffice to create a genuine issue."); *Marks v. National Communications Ass'n, Inc.*, 72 F.Supp.2d 322, 333–34 (S.D.N.Y.1999) ("Ambiguity is not enough to preclude summary judgment.") (quoting *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir.1994)).

The evidence concerning Victor Fein's bookkeeping duties and check-signing function is also insufficient to raise a triable issue of conspiracy. Plaintiffs' only showing with respect to Victor's role is his deposition testimony, consisting of the following description:

What was involved with the bookkeeping?

Belrose [sic] would provide us with those names that took out loans from Belrose, and we would set up an account for them to track their payments and their delinquencies. Not lenders, people who borrowed money from Belrose Credit.

Q. You set up individual accounts?

A. No, not individual bank accounts, we maintained no bank accounts, more loaners.

(Victor Fein Dep. at 10.) Victor further testified that the only checks he wrote were at the direction of Steven Fisher or Fisher's partner, a Mr. Fruhling, which consisted of "interest checks to the lenders and some minor things like to motor vehicles or very few checks were written through Bellerose, my small management fee, bookkeeping fee." (Id. at 14.) Victor also stated that Fein Realty did not keep abreast of funds in the Bellerose bank account, and that he never knew whether Bellerose had enough funds in its account to cover the checks that he signed. (Id. at 15.) In sum, the evidence indicates that Victor Fein's bookkeeping role was limited to signing checks at the request of Steven Fisher or Fisher's partner. Such a limited accounting function is not sufficient to establish membership in a RICO conspiracy. *See Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F.Supp. 248, 255 (S.D.N.Y.1997).

In *Hayden*, the plaintiff-investors alleged that one of the defendants, an accounting firm, conspired to defraud them under § 1962(d) by, *inter alia*, failing to disclose in its financial statements material tax information about the various limited partnerships in which the plaintiffs had invested. Specifically, the plaintiffs alleged that the firm had failed to include the riskless nature of certain repurchase agreement transactions entered into by the limited partnerships, which failed to create legal tax losses, despite the fact that

the Private Placement Memorandum prepared by the accounting firm stated that investors would be entitled to declare their share of the partnerships' profits as ordinary income and deduct any losses under the federal tax laws. *See id.* at 253–54. In dismissing the RICO conspiracy claims against the firm, Judge Sprizzo noted that at most, the plaintiffs had alleged that the firm was aware that the repurchase agreement transactions entailed no risk for tax purposes. *See id.* at 255. Such knowledge, without more, the Court held, was insufficient to state a claim under § 1962(d), because "knowledge without participation is insufficient to establish membership in a conspiracy." *Id.*

In this case, Plaintiffs have not even offered evidence that Victor Fein was aware of any of the acts constituting the RICO enterprise, let alone that he embraced the objectives of that enterprise. Their showing thus falls far below the evidentiary threshold for § 1962(d) liability as identified by the *Hayden* Court.

Finally, for the reasons discussed above, the receipt by Fein Realty of a $10,000 check from Fisher does not raise a material issue of fact with respect to conspiracy, as distinct from mere nepotism. Summary judgment is therefore granted as to Plaintiffs' RICO conspiracy claims against Victor Fein and Fein Realty.

#### (4) *Common Law Conversion*

Plaintiffs have also brought claims based on common law conversion against all Defendants. To make out a claim for conversion under New York law, a plaintiff must establish "legal ownership of a specific identifiable piece of property and the defendant's exercise of dominion over or interference with the property in defiance of the plaintiff's rights." *Di Siena v. Di Siena,* 266 A.D.2d 673, 698 N.Y.S.2d 93, 95 (3d Dept.1999) (citation omitted). "The test for conversion is whether a party exercises dominion or actually interferes with the property to the exclusion or in defiance of the plaintiff's

rights." *Asdourian v. Konstantin,* 93 F.Supp.2d 296, 298 (E.D.N.Y.2000).

Plaintiffs' argument with respect to their conversion claims is somewhat nebulous, given their failure to address this theory specifically in the generalized "Legal Argument" section of their memorandum of law. Viewing the evidence most favorably to Plaintiffs, however, I conclude that their common law conversion claims against Suri Fisher and the Fein Defendants cannot survive the present motions. Plaintiffs have failed to point to any evidence that Suri converted any investor funds from Bellerose to her own or her husband's account—indeed, there is no evidence that she even had access to Bellerose funds prior to or after its bankruptcy.

Plaintiffs' conversion claims against the Fein Defendants are also not viable. As discussed above, Plaintiffs' evidence fails to raise a question of fact as to whether the Fein Defendants had access to funds contributed by Bellerose investors, much less that they exercised dominion over those funds against Plaintiffs' rights. Summary judgment on the conversion claims against the Fein Defendants is therefore granted. *See Ronsdorf v. Banque et Caisse D'Epargne De L'Etat Luxembourg,* No. 98 Civ. 6819, 1999 WL 688299, * 3 (S.D.N.Y. Sept.3, 1999), *aff'd,* 210 F.3d 355 (2d Cir.2000) (summary judgment granted on conversion claim where plaintiff presented no evidence that defendant exercised dominion and control over plaintiff's funds).

#### (5) *Fraudulent Conveyance*

Plaintiffs next bring claims for fraudulent conveyance against all Defendants under New York Debtor and Creditor Law § 273, arising out of the transfer of title to Steven Fisher's house in Rockland County. That statute provides:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without re-

gard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Accordingly, under § 273, "the burden is on the party challenging the conveyance to prove both insolvency and the lack of fair consideration." *Gala Enterprises, Inc. v. Hewlett Packard Co.,* 989 F.Supp. 525, 529 (S.D.N.Y.1998) (citations omitted). Here, Plaintiffs have pointed to no evidence whatsoever with respect to either of these elements—i.e., whether the transfer of title from Steven to Suri Fisher rendered Steven insolvent and whether that conveyance was supported by consideration. The motions for summary judgment as to Plaintiffs' fraudulent conveyance claims are therefore granted.

*(6) Common Law Fraud*

█ Finally, Plaintiffs have asserted claims for common law fraud against Steven and Suri Fisher. To prevail on a cause of action for fraud under New York law, a plaintiff must demonstrate (1) misrepresentation of a material fact, (2) scienter, (3) justifiable reliance, and (4) injury or damages. *See Busino v. Meachem,* 704 N.Y.S.2d 690, 693 (3rd Dept.2000) (citations omitted).

█ On this record, there is no evidence from which a reasonable juror could conclude that Suri misrepresented a material fact to Plaintiffs. Although, as discussed above, Plaintiff Jo Dwek testified that Suri "made clear that [Bellerose] was a good investment," and told Dwek that her sister was "doing well" as a result of her investment, Plaintiffs have offered no evidence suggesting that any comment by Suri about Bellerose was material to any Plaintiff's decision to invest in Bellerose, much less that any such statement was knowingly fraudulent. Accordingly, Plaintiffs' common law fraud claims against Suri are dismissed.

*Conclusion*

The motions for summary judgment of Suri Fisher and the Fein Defendants are granted in their entirety.

This constitutes the order and decision of the Court.